UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

                                        11 Cr. 92 (RPP)

                - against -
                                        **OPINION AND ORDER**

KYLE HARRIS,
                        Defendant.
-----------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On April 27, 2011, Defendant Kyle Harris moved to suppress evidence seized

during a search conducted at 16 Holly Lane in New Bedford, Massachusetts on

December 22, 2010.  Defendant contends that this search was conducted in violation of

his rights under the Fourth Amendment.  The Government filed a brief in opposition to

Defendant's motion on May 11, 2011, and a hearing was commenced on May 17, 2011.

The hearing was continued on June 3, 2011, post-hearing briefs were filed on June 13,

2011, and the Government filed a reply memorandum on June 24, 2011.

## BACKGROUND

During the suppression hearing held on May 17, 2011 the Government called as

witnesses Agent Guy McCormick of the Agency of Tobacco, Firearms and Explosives

(the "ATF"), while the defense called Tarean Joseph.  At the continuation of the

suppression hearing on June 3, the Government called Agent Michael Zeppieri of the

ATF.

I.      Testimony of Agent Guy McCormick.

Agent Guy McCormick has been employed by the ATF as a special agent since

2004, and is currently assigned to "New York Group One" which is a group focused on

1

violent crimes and gangs.  (Transcript of the May 17, 2011 Suppression Hearing ("May 17 Tr." at 4.)  His duties entail investigating crimes involving narcotics, firearms, homicides, robberies and other crimes of violence.  (<u>Id.</u> at 5.)

On December 22, 2010, Agent McCormick participated in the arrest of the Defendant, Kyle Harris, at 16 Holly Street in New Bedford, Massachusetts.  (<u>Id.</u> at 5-6.) Prior to this arrest, Agent McCormick had been the ATF case agent in the agency's investigation of Mr. Harris. (<u>Id.</u> at 6.)  Pursuant to that role, Agent McCormick initiated the case, "swore out the arrest warrant," and was responsible for administrative duties and enforcement actions pertaining to the case.  (<u>Id.</u>)  On the day of the arrest, Agent McCormick was part of the surveillance team, and subsequently part of the arrest team once Mr. Harris was located.  (<u>Id.</u>)  Also present at the arrest, to Agent McCormick's recollection, were his supervisor, Agent Michael Zeppieri, several U.S. Marshals and several members of the New Bedford Police Department.  (<u>Id.</u>)

Late in the morning of December 22, 2010, Agent McCormick arrived at 16 Holly Street with an arrest warrant for Kyle Harris.  (<u>Id.</u> at 6-7.)  16 Holly Street is a multilevel residential home, with three entrances.  (<u>Id.</u>)  Agent McCormick approached the ground floor entrance, and began knocking on the door, while another team of officers knocked on the door of a separate entrance located a level above him.  (<u>Id.</u> at 8.)  He then heard one of the officers at the entrance on the upper floor say "we have contact."  (<u>Id.</u> at 9.) Agent McCormick then walked up the stairs and entered the apartment through the second floor entrance.  (<u>Id.</u>)

Upon entering the apartment, Agent McCormick could see that several of the officers were in contact with "what [he] assumed at the time were residents of the

apartment." (Id. at 10.)  Other officers were conducting a security sweep of the

apartment.  (Id.)  Agent McCormick joined in the security sweep to make sure that "there

was nobody hiding in any of the rooms with firearms or trying to evade contact with the

police."  (Id.)  During the sweep, the officers came across someone in the bathroom, but

Agent McCormick testified that he did not believe this person was hiding from the police.

(Id.)  In total, Agent McCormick recalled that there were three or four individuals in the

apartment, other than members of law enforcement, including Mr. Harris and Mr. Tarean

Joseph.  (Id. at 11.)

    Agent McCormick testified that "when you enter the apartment [at 16 Holly

Street], you are first looking at…a kitchen sitting area, then straight back was a, I guess

like a living room area that had a couch in the center and a television against the right

wall."  (Id. 11-12.)  When Agent McCormick first encountered Mr. Harris, he was sitting

handcuffed on a couch in the middle of the living room.  (Id. at 12.)  Mr. Joseph was

handcuffed and sitting in a chair.  (Id.)  Agent McCormick testified that "if you are

looking into the apartment, there was the couch in the middle of [the] room.  That's

where Mr. Harris is sitting.  There was an individual, Mr. Joseph, was sitting in a chair

the right of the room, and then there was another individual sitting in the back of the

room on another chair.  And I don't remember if he was the same individual that I think

we encountered in the bathroom."  (Id. at 13.)  Agent McCormick described Mr. Harris as

"calm," and testified that "[Mr. Harris] was acting like a gentleman."  (Id. at 13.)

    Agent McCormick walked over to the couch where Mr. Harris was sitting.  (Id. at

14.)  Meanwhile, other agents were taking names and information from the other

individuals in the apartment, including Mr. Joseph.  (Id.)  Agent McCormick testified:

> I spoke to Mr. Harris and said, Kyle Harris? He said, yes. We're federal agents. We have an arrest warrant for you. At that point I think I said which room is yours? And he kind of motioned with his head over his shoulder, the room behind him. And it was clear it was the only room that was directly behind the couch. And I said, can I go in there and do you have any guns or drugs, anything in there? He said, no, I don't. I said, can I go and look around and search and he said sure. At which point I went in and I began to search his room.

(Id.) The Government then asked "[at] any point while you were searching his room or even before you started searching his room did Kyle Harris say you could not search his room?" to which Agent McCormick answered "no." (Id.) The Government next asked "when you asked him [for consent] did he answer you clearly or did he mumble? How did he answer you when you asked him?" and Agent McCormick replied "He answered me clearly but he gave me a short answer like "yes" or "sure", "I don't care" anything along those lines but it was definitely affirmative that I could search his room." (Id.)

At the time Agent McCormick was speaking with Mr. Harris, he was with Special Agent Zeppieri of the ATF, and there were other marshals and detectives present in the room. (Id. at 15.) Agent McCormick did not have his gun drawn at the time he was speaking to Mr. Harris. (Id.)

Agent McCormick next testified that he did not ask Kyle Harris to sign a written consent form when he requested consent to search his room. (Id.) He explained that he did not have such a form with him, because the situation was "fluid," and in order to get someone to sign a consent form one would need to remove the subject's handcuffs. (Id. at 15-16.) Agent McCormick testified that "[i]t's an agent safety issue with uncuffing somebody when they're in their own residence. . . We don't [un]cuff them until we get them into a holding cell or some other kind other police custody." (Id. at 16.) The ATF

4

does not require its agents to obtain a signed form before searching pursuant to consent. (Id.)

After Mr. Harris consented to Agent McCormick searching his room, Agent McCormick entered the room and found a digital scale, several cell phones, and a Police Athletic League identification from the Bronx for Mr. Harris.  (Id.)  Agent McCormick then testified that he did not search the rest of the apartment because "[w]e did not have consent to.  The only other thing we searched was we searched the couch because it would have been in immediate grabbing distance of Mr. Harris when he is sitting there." (Id.)  The officers found cell phones in the vicinity of the couch.  (Id. at 17.)

While Agent McCormick was speaking with Mr. Harris he noticed that Mr. Joseph was speaking to a New Bedford Detective, who was asking Mr. Joseph for his name, date of birth and address.  (Id.)  Agent McCormick did not speak with Mr. Joseph. (Id.)  The third individual that Agent McCormick identified was speaking with other officers at the same time, and stated that the apartment was his.  (Id.)  Agent McCormick never heard Mr. Joseph object to the officers searching Mr. Harris's room.  (Id. at 18.)

Agent McCormick testified that he did not Mirandize Mr. Harris in the apartment, but that he did Mirandize Mr. Harris later that day, after Mr. Harris's arrest, while they were in transit.  (Id. at 18-19.)

On cross-examination, Agent McCormick testified as to his training as an ATF agent, and stated that he was trained that "we can get written consent [prior to a search]. There is no preference as long as we have another agent or law enforcement officer who witnesses the verbal consent."  (Id. at 20.)  Agent McCormick stated that in this instance, Agent Zeppieri witnessed the consent.  (Id. at 21.)  Agent McCormick then

acknowledged that although he was not carrying a search consent form with him on the day of the arrest, these forms are generally available at the ATF's offices.  (Id. at 24.)  But, he explained "I don't [bring forms with me] because there's always a danger when they sign this out in the field that they could get violent.  In my time as an ATF agent I get oral consent with a witness, I don't, I don't get written consent."  (Id.)  Agent McCormick testified that he has never obtained written consent to search.  (Id.)  Agent McCormick agreed that the "sole issue" from his perspective with using the form is the risk of uncuffing the target of the investigation and creating a dangerous situation.  (Id. at 25.)

Agent McCormick indicated that there could have been about eight members of law enforcement in the room at the time that he obtained Mr. Harris's consent to search.  (Id. at 26.)  He stated that he still felt that uncuffing Mr. Harris to obtain written consent would have been dangerous because "Mr. Harris is accused of an extremely violent crime and I was not going to uncuff him at all until he was in a police holding cell. . . . The [arrest] warrant was for a Hobbs Act robbery where the victim was very brutally stabbed."  (Id.)

Agent McCormick was then asked to repeat precisely what he said when he requested Mr. Harris's consent to search the bedroom.  He replied "I asked Mr. Harris…do you have any guns or drugs or anything like that in your room?  He said, no.  And I said to him, can I get a look around?  Can I go search your room?  And I don't remember if it was a short response.  It was "yes," "sure," something along those lines."  (Id. at 27.)  Agent McCormick did not recall what Mr. Harris's exact response was.  (Id.)  He explained that he remembers it being an affirmative response "because I remember

after that I said, okay.  I am allowed to search his room, so I went and searched his room."  (Id. at 28.)  He continued, "If he had said, no, you are not allowed to search, I would not have searched.  That's happened to me many times."  (Id.)  Defense counsel then asked "[t]he fact that you searched you know that he gave you consent?" and Agent McCormick replied, "[t]hat's correct."  (Id.)

Agent McCormick then testified that he did not recall the exact time that he entered the apartment, only that it was late morning.  (Id. at 28-29.)  He also stated that he could not recall whether there were three or four people in the apartment when law enforcement arrived.  (Id. at 29.)

Agent McCormick testified that if he were to have searched Mr. Harris's room without consent, the search would have been in violation of ATF policy.  (Id. at 31.)  Agent McCormick also testified that were he found to have committed such a violation of ATF policy he could be subject to punishment.  (Id.)

On redirect examination, Agent McCormick testified that he did not have any doubt that Mr. Harris gave him consent to search the bedroom.  (Id. at 32-33.)

II.     Testimony of Tarean Joseph

The defense called as a witness Tarean Joseph.[1]  Mr. Joseph testified that he is 25 years old, and that he has known Mr. Harris for about seven years.  (May 17 Tr. at 48.)  He explained that he is acquainted with Mr. Harris from having grown up in the same

---

[1] Prior to Mr. Joseph testifying, the Court, on the advice of the Government, recommended that he consult with counsel with regard to his right not to incriminate himself.  (May 17 Tr. at 35-36.)  The Government suggested that Mr. Joseph be warned that there is a pending criminal investigation involving him, and that some of the questions that they intended to ask Mr. Joseph would relate to his relationship with Mr. Harris and possibly to criminal activity that the two men engaged in together.  (Id. at 34-35.)  This warning was then given to Mr. Joseph by the Court.  (Id. at 42-43.)  The Court appointed the CJA Attorney for the day, Mr. Schmidt, to represent the witness.  (Id. at 45.)  Following consultation with Mr. Schmidt, Mr. Joseph proceeded to testify.  (Id. at 48.)

neighborhood.  (Id.)  Mr. Joseph testified that he is originally from the Bronx, but currently resides in New Bedford, Massachusetts, where he is unemployed.  (Id.)

Mr. Joseph testified that he had been arrested twice, and had pled guilty to offenses including marijuana possession, gun possession, and crack possession, and for being "in a house with a gun and it was drugs there."  (Id.at 48-49.)

Mr. Joseph testified that on the morning of December 22, 2010, he was in New Bedford, Massachusetts, at 16 Holly Street, with Kyle Harris and a person named Carlito. (Id. at 49.)  Mr. Joseph woke up at about nine o'clock, then walked to the living room where saw Mr. Harris playing a video game.  (Id.)  Meanwhile, Carlito was getting clothes in order to take a shower.  (Id.)  Mr. Joseph testified that Mr. Harris told him that the woman who owned the house at 16 Holly Street had told Mr. Harris that her boyfriend would be coming because he was picking up his stepson, who was ill, from school.  (Id.)  Next, Mr. Joseph heard a knocking on the door.  (Id. at 49-50.)

Mr. Joseph then opened the door, and, realizing it was police behind the door, closed it somewhat, leaving it ajar by about three inches.  (Id. at 50.)  He asked the officers whether he could help them, and the officers replied "is Kyle Harris here?"  (Id.) Mr. Joseph then asked "do you have a warrant?" to which the officers replied "yes."  (Id.) Mr. Joseph then asked to the see the warrant, but the police did not respond.  (Id.)  He then asked again, "can I see the warrant?" at which time the officers "Bogart[ed] themselves in the house," pushed the door open and pushed Mr. Joseph out of the way. (Id.)  The police then handcuffed Mr. Joseph and Mr. Harris, and went to the bathroom and retrieved Carlito.  (Id.)

After being handcuffed, Mr. Joseph was standing in the kitchen, while Kyle Harris was in the living room, where the officers had sat him on the couch.  (Id.)  Mr. Joseph testified that he was about three feet away from Mr. Harris in the living room.  (Id.)  He testified that he was able to overhear "whatever was happening" with Mr. Harris, and that he remained in this position in the kitchen until the police left the apartment.  (Id. at 51.)

After he was handcuffed, the police asked Mr. Harris and Mr. Joseph their names.  (Id.)  Mr. Joseph testified that he was in a position to hear the officers speaking to Mr. Harris, but that he never heard the officers ask Mr. Harris whether he consented to a search of his bedroom.  (Id. at 51-52.)

Mr. Joseph then described the apartment:

It's one bedroom at the end. . . In the first part of the living room there's two bedrooms. . . At the second part of the living room, there's just a living room, like a little dining area, like a little office, then in the kitchen area there's two bedrooms there.

(Id. at 52.)  Mr. Joseph explained that Mr. Harris's bedroom was the one on the left hand side of the living room.  (Id.)  He saw a police officer go into that bedroom and search that bedroom, but never heard him ask permission of anyone prior to searching that bedroom.  (Id.)  After the police searched Mr. Harris's bedroom, they asked Mr. Joseph what room he slept in.  (Id. at 53.)  Mr. Joseph indicated which bedroom he slept in and, without asking Mr. Joseph whether they could search his bedroom, the officers then went into that room and searched it.  (Id.)  After that search they removed Mr. Joseph's handcuffs.  (Id.)  At that time, "Kyle [Harris] was joking with [the police], like, yo, can I at least get a coffee or something?"  (Id.)

On cross-examination, Mr. Joseph testified that there were anywhere from five to eight officers in the apartment during this encounter.  (Id.)  He stated that the officers were in plain clothes but had vests on.  (Id. at 54.)  Mr. Joseph explained some of the officers said they were from New York, and some said they were from New Bedford. (Id.)  Mr. Joseph testified that he was not arrested that day, nor has he been arrested since that time.  (Id.)  He testified that once the police took Mr. Harris out of the house, the police released Mr. Joseph.  (Id.)

Mr. Joseph testified that he and Mr. Harris had been arrested in September of 2010 for possession of marijuana in a car, to which Mr. Joseph pled guilty.  (Id. at 56-57.) Mr. Joseph further testified that he and Mr. Harris were arrested together in August of 2004, for criminal possession of a loaded firearm.  (Id. at 57-58.)  The Government then asked whether it wasn't true that Mr. Joseph had been arrested fourteen times.  (Id. at 58.) Mr. Joseph responded that "I consider me being arrested with me being gone a fair amount of time, not no three days."  (Id.)  The Government then defined arrested to mean "having police officers put handcuffs on you and take you to a station," and asked Mr. Joseph again whether he hadn't been arrested fourteen times.  (Id. at 58-59.)  Mr. Joseph explained that he had been arrested more than three times, but that he didn't know the exact number of arrests because he "didn't keep count."  (Id. at 59.)

Mr. Joseph testified that he is not from New Bedford, Massachusetts, and that at the time of the arrest he was not working in New Bedford Massachusetts, has no family in the area, and was not attending school there.  (Id. at 59-60.)

The Government then inquired as to Mr. Joseph's criminal history in the Bronx. (Id. at 61.)  Mr. Joseph testified that he was arrested on October 4, 2010 for possession of

a weapon in the vicinity of 321 East 153rd Street.  (<u>Id.</u>)  The Government asked whether

Mr. Joseph sold drugs with Mr. Harris at 321 East 153rd Street, and Mr. Joseph exercised

his Fifth Amendment right not to incriminate himself.  (<u>Id.</u> at 62.)  The Government next

asked the Mr. Joseph "You were involved in a murder with Kyle Harris, correct?" to

which the witness replied, "Incorrect.  What kind of question is that?" (<u>Id.</u>) The

Government then asked whether Mr. Joseph and Kyle Harris possessed guns together, to

which the witness answered "Yeah."  (<u>Id.</u> at 63.)  The Government asked whether on

September 14, the witness and Kyle Harris stabbed someone in retaliation for Mr. Joseph

being shot earlier that year.  (<u>Id.</u> at 66.)  The witness replied "Honestly, no."  (<u>Id.</u>)

   The Government next asked about the day that Mr. Harris was arrested.  (<u>Id.</u> at

69.)  Mr. Joseph testified that he was with Mr. Harris the day he was arrested, and that he

observed law enforcement agents speaking to Mr. Harris after they entered the apartment.

(<u>Id.</u>)  The Government asked "how many agents were speaking to Kyle Harris?" and Mr.

Joseph replied "[i]t wasn't really because, like, no, it wasn't really much talking to him.

They was just pretty much asking him which room he sleep in and they asked me my

name."  (<u>Id.</u> at 70.)  Then asked "How many agents were asking Kyle Harris which room

he slept in?" and Mr. Joseph replied "I only heard one officer or agent ask him that."

(<u>Id.</u>)  The Court then asked:

| | |
|---|---|
| THE COURT: | How many persons were around Kyle Harris? |
| THE WITNESS: | Was at least three or four around him. |
| THE COURT: | How many were around you? |
| THE WITNESS: | Two around me, one at the door and one was searching the room already and one was at the door and one was with Carlito in the second part of the living room. |

. . .

| THE COURT: | Who was talking to you? |
| THE WITNESS: | The officer that handcuffed me.  He was standing by me the whole time. |
| THE COURT: | He asked you questions? |
| THE WITNESS: | All he asked me pretty much is which one was my room.  And another officer I don't know his name but he came in with the laptop and he ran my name… |

(Id. at 71.)  The Court then asked whether, while he was having this conversation with the police officer, other offers were talking to Carlito, and the witness answered that one officer was talking to Carlito.  (Id. at 72.)   Mr. Joseph explained that while he was talking to the officers, Mr. Harris was talking to the police as well, saying that the police officers looked familiar to him.  (Id. at 73.)  Mr. Joseph testified that "we all was joking about it."  (Id.)  Mr. Joseph testified that he didn't hear what the officers were saying to Carlito during this time because he was in a different part of the room.  (Id.)

Mr. Joseph testified that in addition to searching Mr. Harris's room, the police also searched his room.  (Id. at 75.)  Mr. Joseph further testified that the police asked "who[se] room is this?  I said, that's where I sleep at.  They said they got a box of cigarettes.  They said whose was it?  I said, it's mine."  (Id.)  Mr. Joseph did not know whether the police took the box of cigarettes.  (Id.)

At the close of cross-examination, the Court inquired about what conversations Mr. Joseph had with the police officers at the time he first opened the door.  (Id. at 76.)  Mr. Joseph testified that when he first opened the door to the police officers the morning of the arrest they he spoke to them about "why would they want to come in the house." (Id.)  Mr. Joseph also testified that he asked them for their warrant but that the police never showed it to them.  (Id.)

12

On re-direct examination, Mr. Joseph again testified that he heard the officers ask Mr. Harris where he sleeps, but never heard any officer ask Mr. Harris for consent to search his room.  (Id. at 80.)

III.    Testimony of Agent Michael Zeppieri

Agent Michael Zeppieri works as a group supervisor for the ATF.  (June 3, 2011 Suppression Hearing Transcript ("June 3 Tr.") at 85.)  As group supervisor, Agent Zeppieri's responsibilities include managing a group of agents and coordinating case agent.  (Id. at 85-86.)  Agent Zeppieri is assigned to New York Group One, which he described as a violent crime group.  (Id. at 86.)

Agent Zeppieri was involved in the arrest of Mr. Harris at 16 Holly Street, New Bedford, Massachusetts on December 22, 2010.  (Id. at 87.)  At the time of the arrest, several U.S. marshals, detectives, and police officers from New Bedford, as well as Agent Guy McCormick from the ATF were present.  (Id. at 87-88.)  Agent Zeppieri testified that 16 Holly Street is located on a narrow street in a residential neighborhood, comprised of small to medium sized multifamily homes.  (Id. at 88.)  16 Holly Lane is a multifamily home.  (Id.)   Kyle Harris was arrested in an apartment on the second floor. (Id.)

Agent Zeppieri entered the building on the ground floor, after law enforcement officers had finished conducting a security sweep of the second floor apartment and then opened the ground floor door.  (Id. at 89.)  Agent Zeppieri then walked up the stairs to the apartment.  (Id.)  He entered the apartment about two to five minutes after the first group of officers had entered the apartment.  (Id.)  Upon entering, Agent Zeppieri saw Kyle Harris, handcuffed, sitting on a couch in the center of a common room.  (Id. at 89-

13

90.)  Agent Zeppieri had not been present at the time Mr. Harris was handcuffed.  (Id. at

90.)  Also present in the room were seven to ten law enforcement officers and two

civilians, i.e., persons not affiliated with law enforcement.  (Id.)  One of these civilians

was sitting in a chair closer to the entry, near the kitchen, and the other was on the

opposite side of the living room.  (Id.)  Each of the civilians were several feet away from

one another.  (Id.)  Agent Zeppieri testified that when he first entered the apartment, Mr.

Harris appeared to be calm.  (Id.)

    Agent Zeppieri testified that he did not immediately recognize Mr. Harris upon

entering the apartment.  (Id. at 91.)  Upon entering the apartment, Agent Zeppieri

stopped in the kitchen area where he was told by one of the U.S. Marshals that Mr.

Harris was reluctant to say his name.  (Id.)  Agent Zeppieri walked to Mr. Harris, who he

then recognized, and said "Hey Kyle, what's up?" and Mr. Harris looked up at him.

(Id.)

    Agent Zeppieri then approached Agent McCormick and asked whether Mr.

Harris had been Mirandized, and recommended that the agents obtain consent to search

the apartment.  (Id. at 92.)  Agent Zeppieri testified that then he and Agent McCormick

then turned to Kyle Harris and read him his Miranda rights.  (Id.)  Agent Zeppieri did

not recall whether it was he or Agent McCormick who read Mr. Harris his Miranda

rights, but he recalled that a white pocket-size card was removed from either his wallet

or Agent McCormick's wallet and read to Mr. Harris.  (Id. at 92.)  While Mr. Harris was

being Mirandized, neither Agent Zeppieri nor Agent McCormick had their guns drawn.

(Id.)

After the Miranda rights were read to Mr. Harris, Agent Zeppieri asked Mr.
Harris whether there was anything in the apartment that would be dangerous to law
enforcement, such as firearms or drugs.  (Id.)  Mr. Harris said no.  (Id.)  Agent Zeppieri
then asked Mr. Harris "if we could take a look around, and he said yes."  (Id.)  Agent
Zeppieri then asked Mr. Harris which bedroom was his, and Mr. Harris gave a "head
nod backward" pointing towards a bedroom that was behind him.  (Id.)   Agent Zeppieri
then remained with Mr. Harris while other law enforcement officers searched the
bedroom.  (Id. at 93.)  At one point, Agent Zeppieri entered the bedroom and saw a few
items that were pointed out to him, including newspapers, cell phones, and a small scale.
(Id.)  Agent Zeppieri testified that Mr. Harris never withdrew his consent to the search.
(Id.)

Agent Zeppieri testified that during the morning of Mr. Harris's arrest, he did not
have a consent form, which he described as a form created by the ATF that can be used
to get consent to search an apartment.  (Id. at 93-94.)

Agent Zeppieri testified that Tarean Joseph was "somewhat behind him" during
his interactions with Mr. Harris.  (Id.  at 94.)  He further testified that during his
conversation with Mr. Harris regarding consent to search his bedroom, he did not
specifically recall other officers speaking to Mr. Joseph, but that he recollected Mr.
Joseph speaking with other officers during the time that he and the other officers were in
the apartment.  (Id. at 94-95.)

On cross-examination, Agent Zeppieri testified that while he supervises Agent
Guy McCormick and was aware of Agent McCormick's testimony in this matter, he had
not discussed Agent McCormick's testimony with him.  (Id. at 96.)  Agent Zeppeiri,

however, had discussed the arrest itself with Agent McCormick since the date of the arrest, albeit not in detail.  (Id. at 97-98.)  Agent Zeppieri also reviewed a report about the arrest that was submitted to him by Agent McCormick.  (Id. at 98.)

Agent Zeppieri testified that in his role as supervisor, he sometimes provides informal training and advice to other ATF agents.  (Id. at 99-100.)  He also testified that he is familiar with written consent forms used by the ATF to document consent to searches, and that he has used them in the course of searches he previously conducted. (Id. at 100.)  Agent Zeppieri did not use such a form on the date of the search in question.  (Id. at 102.)  He testified that "I didn't plan on bringing one.  I don't know why there wasn't one there.  It's not required to have one."  (Id.)  At the hearing, Agent Zeppieri was provided with a copy of the ATF's written consent form as an exhibit, which he identified as an outdated version of the consent form currently in use.  (Id. at 100-101.)  He further testified that he typically makes it a practice to make sure there are some on hand just in case he needs one, but in this case he didn't have any.  (Id. at 102.)

Agent Zeppieri was unable to recall the exact words he used to ask Mr. Harris for his consent to search the room, but testified that it was akin to "do you mind if I take a look around or may I look around."  (Id. at 104.)  Agent Zeppieri testified that he did not advise Mr. Harris that he had the right to refuse to give his consent, that he may demand a search warrant, that any evidence of crime found can be used against him in a court of law, that he may consult an attorney in order to determine whether to consent to search or that he could withdraw his consent at any time.  (Id. at 104-105.)  All of these instructions are printed on the written consent form, which was not given to Mr. Harris. (Id. at 103.)

Agent Zeppieri testified that there were several reasons that he did not obtain written consent in this case.  (Id. at 105.)  First, he did not have any copies of the form with him at the time.  (Id.)  Second, he testified that "there's always an element of danger if you uncuff someone in an apartment.  There were several…people in [the apartment] and we were not comfortable with having somebody without handcuffs on at that point."  (Id. at 105-106.)  Agent Zeppieri testified that during his encounter with Mr. Harris, Mr. Harris was calm and did not show any signs of aggression.  (Id. at 106-107.) Agent Zeppieri explained that even though there are seven to ten officers in the apartment and all of the civilians were handcuffed, there was a concern "about even the slightest injury. . . I don't think there was a fear that he would overpower us, but there is definitely a fear that he could injure one of us in an attempt."  (Id. at 107.)  Agent Zeppieri testified that he has never been involved in a situation where someone was injured in conjunction with obtaining written consent to search.  (Id. at 108.)

Agent Zeppieri testified that "many times" ATF agents use the written consent forms when obtaining the consent of a "third party," such as when the target of the investigation is not present at a residence, and they request consent from the custodian of the apartment.  (Id. at 108-109.)  He testified that there have also been instances when he has obtained written consent to search from the individual under arrest.  (Id.)

Agent Zeppieri testified that he understood that, if the Court rules there was no consent given to search in this case, the evidence found in the apartment could be suppressed.  (Id. at 110.)  Agent Zeppieri further testified that he understood that in the event the search was found to have been conducted without consent, the Court could

rule that he engaged in an improper search, and such a finding could subject him and Agent McCormick to disciplinary action.  (<u>Id.</u> at 110-111.)

On redirect, Agent Zeppieri again testified that after asking Mr. Harris whether he could "take a look around," he asked Mr. Harris which room was his bedroom.  (<u>Id.</u> at 111.)  Mr. Harris then nodded his head to indicate the room behind him.  (<u>Id.</u>)  Agent Zeppieri also testified that he was aware that if he were found to have perjured himself during his testimony at the suppression hearing, the consequences could include jail time.  (<u>Id.</u>)

## DISCUSSION

The Defendant contends that the evidence seized during the December 22, 2010 search, as well as all statements or additional evidence obtained as a result of that seizure, should be suppressed for several reasons.  First, the defense argues that the Government failed to show that the law enforcement officers conducting the search had consent to search Mr. Harris's bedroom at 16 Holly Lane.  Second, Defendant argues that even if consent had been given, the consent was not constitutionally valid because it was coerced.  Finally, the defense argues that the search of the backpack found in Mr. Harris's bedroom exceeded the scope of any consent given by Mr. Harris.  The Government contends that Mr. Harris did provide consent to search his bedroom, there is no indication that the consent was obtained through coercion, and that separate consent to search a closed container is unnecessary under the law.  For the reasons stated below, Defendant's motion to suppress is denied.

I.     Standards Governing Consent to a Warrantless Search

Warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).  One exception to the warrant requirement is a search conducted pursuant to consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Where the government relies on consent to justify a warrantless search, the Government bears "the burden of proving that the consent was, in fact, freely and voluntarily given by a preponderance of the evidence." United States v. Porras-Quintero, No. 07 Cr. 228 (RPP), 2007 WL 4531552 at *7 (S.D.N.Y. Dec. 21, 2007).

"So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995).  Consent is valid if it is given voluntarily and is not the product of duress or coercion, evaluated in light of the totality of the surrounding circumstances. Schneckloth, 412 U.S. at 227.  "The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker, and is a question of fact to be determined from all of the surrounding circumstances." United States v. Arango-Correa, 851 F.2d 54, 57 (2d Cir. 1988).  "The absence of Miranda warnings does not make consent to search invalid *per se*." United States v. Memoli, 33 F. Supp. 2d 233 (S.D.N.Y. 2004).

Consent "may be inferred from an individual's words, gestures or conduct." United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981).  "[A] search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" Id.

II.     Mr. Harris Consented to the Officer's Search of His Bedroom

The Government has established, by a preponderance of the credible evidence, that Mr. Harris consented to the search of his bedroom on December 22, 2010.  As Defendant argues, Agent McCormick's and Special Agent Zeppieri's testimony at the hearing was inconsistent as to various significant details.  Their testimony was wholly consistent, however, as to the pivotal fact; whether Mr. Harris consented to the search.

Officer McCormick testified that after Mr. Harris had been handcuffed and was seated on the couch, he asked Mr. Harris which bedroom belonged to him, in response to which Mr. Harris nodded his head backward to indicate the room behind him.  (May 17 Tr. at 14.)  He then asked Mr. Harris "do you have any guns or drugs, anything in there?" and Mr. Harris replied "no, I don't."  (Id.)  Agent McCormick testified that he next asked "Can I go and look around and search," and Mr. Harris replied "yes" or "sure" or "I don't care."  (Id.)

Agent Zeppieri's testimony contrasts with that of Officer McCormick in that Agent Zeppieri testified that it was he, not Officer McCormick, who requested and obtained Defendant's consent.  Agent Zeppieri also testified that either he or Agent McCormick read Mr. Harris his Miranda rights off of a printed card prior to requesting consent to search. (June 3 Tr. at 92.)  This contrasts with Agent McCormick's testimony that Mr. Harris was only Mirandized after the search.  (May 17 Tr. at 18-19.)

Agent Zeppieri's testimony is consistent with that of Agent McCormick, however, as to the substance of the conversation regarding Mr. Harris's intent.  Agent Zeppieri testified that he asked Mr. Harris whether there was anything dangerous in the apartment such as guns or drugs.  (June 3 Tr. at 92.)  He then asked Mr. Harris "can we take a look

around," and Mr. Harris said "yes."  (Id.)  After that, Agent Zeppieri testified that he asked Mr. Harris which room was his, and that Mr. Harris nodded his head backward to indicate the room behind him, just as Agent McCormick had described.  (Id.; May 17 Tr. at 14.)

Both witnesses testified that after obtaining consent, officers entered the bedroom and began to search. (May 17 Tr. at 16; June 3 Tr. at 93.)   No evidence was presented to indicate that Mr. Harris ever objected to the search of his bedroom, or that he ever withdrew his consent.

The defense relied on the testimony of Tarean Joseph to establish that Mr. Harris did not consent to the search.  Mr. Joseph's testimony is entitled to less weight than that of the officers for two reasons.  First, Mr. Joseph testified that while the police were speaking with Mr. Harris, he was speaking with other officers, who were asking him for his name so that they could enter it into a computer. (May 17 Tr. at 51, 70-71.)  The simultaneity of the two conversations calls into question the ability of Mr. Joseph to hear the details of Mr. Harris's conversation.  According to the Government witnesses, Mr. Harris was asked something to the effect of "can we take a look around," to which he replied "sure," or "yes." This conversation, as described by the Government, was very brief, and it is more likely than not that Mr. Joseph would have been unable to hear such a brief exchange in view of the his testimony that he was being asked questions about his name by other officers around the same time. (Id.  at 69:23-70:4-6.)   Second, Mr. Joseph's testimony must be viewed in light of his motivation in this case.  Mr. Joseph testified on cross-examination that he and Mr. Harris had been friends for many years, and that they had engaged in assorted criminal activity together.  (Id. at 48, 63.) Thus,

Mr. Joseph has a motivation to assist his friend in evading prosecution by testifying in his favor.

While the government witnesses' testimony was not entirely consistent, both officers testified that Mr. Harris gave his consent, distinguishing this case from the case cited by the Defendant, United States v. Santos, 303 F. Supp. 2d 333, 342-43 (S.D.N.Y. 2003), where officers gave conflicting testimony as to whether consent was given. Moreover, a finding that Mr. Harris gave consent aligns with the testimony regarding the circumstances of his encounter with the police. Both Officer McCormick and Officer Zeppieri testified that Mr. Harris was calm at the outset of the encounter. (May 17 Tr. at 13; June 3 Tr. at 90.) Officer McCormick stated that Mr. Harris conducted himself "like a gentleman." (May 17 Tr. at 13.) The defense witness, Mr. Joseph, explained that Mr. Harris had joked with the police about getting a cup of coffee after the search, which again is evidence that Mr. Harris appeared to be at ease during his arrest. (Id. at 53.) Furthermore, it is notable that no actual contraband was retrieved from Mr. Harris's bedroom. It might seem illogical if Mr. Harris provided consent to search knowing that drugs or weapons would be found in the bedroom, but in this instance the evidence seized consisted of mobile phones and a digital scale in his room, as well as cell phones from the vicinity of the couch upon which Mr. Harris was seated, which are not necessarily items that a defendant would feel compelled to conceal from law enforcement.

In view of the testimony elicited at the suppression hearing, this Court finds that the Government has established, by a preponderance of the evidence, that Mr. Harris consented to the law enforcement officers' search of his bedroom during his arrest on December 22.

III.    Voluntariness of the Consent

The defense argues that even if Mr. Harris gave his consent, "it is clear that any alleged consent was not voluntarily given, and thus was invalid."  (Def.'s Post-Hearing Mem. in Supp. at 11.)

"Consent to search should be deemed valid if, given the totality of the surrounding circumstances, the consent was voluntarily given, and not the product of duress or coercion."  U.S. v. Kon Yu-Leung, 910 F.3d 33, 41 (2d Cir. 1990) (citing Schneckloth, 412 U.S. at 226-27).  To determine the voluntariness of consent, the Court must consider the totality of the surrounding circumstances, including whether the defendant was asked for consent in conjunction with his arrest, the length of time a defendant was detained prior to giving his consent, and whether threats or aggressive language were used by law enforcement in order to secure consent.  See United States v. Isofoia, 370 F.3d 226, 231 (2d Cir. 2004) (affirming district court's consideration of each of these factors in determining whether consent to search was freely given.) "In determining voluntariness under this fourth amendment test, knowledge of the right to refuse consent is only one factor in the analysis." Kon Yu-Leung, 910 F.2d at 41.

The record does not support a finding that Mr. Harris was coerced into giving his consent to search the bedroom.  Mr. Harris was handcuffed when the officers requested consent to search the bedroom, and the search was conducted pursuant to their execution of an arrest warrant.  Nevertheless, the officers did not have their guns drawn at the time they requested consent, nor has any evidence been presented that they yelled at Mr. Harris or made any threats in order to gain consent.  Mr. Harris was not detained for a lengthy period prior to providing consent.  Most importantly, both of the Government

witnesses consistently testified that Mr. Harris was calm during the encounter, and the defense witness Mr. Joseph testified that Mr. Harris joked with the officers.  This testimony does not describe a coercive encounter.

Despite the fact that law enforcement requested Mr. Harris's consent in the context of his arrest, no other evidence has been presented to indicate that Mr. Harris gave consent while under duress or that he was coerced into consenting.  The evidence presented shows that the consent provided by Mr. Harris was "the product of an essentially free and unconstrained choice," and valid.  See Schneckloth, 412 U.S. at 225.

IV.    Scope of Consent

The Defendant contends that evidence seized from a backpack found in the bedroom, namely a digital scale, should be suppressed because the search of the backpack exceeded the scope of the Defendant's consent.

"The standard for measuring the scope of a subject's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  Florida v. Jimeno, 500 U.S. 248, 251 (1991).  "The Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to [conduct the search]."  United States v. Garcia, 56 F.3d 418, 423-24 (2d Cir. 1995).  While a suspect "may delimit as he chooses the scope of a search to which he consents[, ] if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization."  Jimeno, 500 U.S. at 252.  "If the consent to search is entirely open ended, a reasonable person would have no cause to believe that the

search will be limited in some way." United States v. Snow, 44 F.3d 133, 135 (2d Cir. 1995).

The consent given in this case was communicated in a very open-ended manner. The request for consent was formulated in general terms; "can we take a look around?" is not self-limiting. Mr. Harris's response of "yes" or "sure" did not impose any restrictions on the police's ability to search any area that they wished to inspect. The request for consent immediately preceded or was followed by the question of which bedroom Mr. Harris was staying in, which Mr. Harris answered, putting him on notice that the police intended to search the bedroom. He then would have been able to see the police officers entering the bedroom, and had the opportunity to object and restrict their ability to search closed containers. While the defense argues that Mr. Harris's response of "yes" could not reasonably be understood to mean that consent had been given to search the backpack, "[i]t is self-evident that a police officer seeking general permission to search a [room] is looking for evidence of illegal activity. It is just as obvious that such evidence might be hidden in closed containers." Snow, 44 F.3d at 135. Mr. Harris had recently arrived in New Bedford from the Bronx, and it was reasonable for the police to search a backpack found in his room for evidence of illegal activity.

A reasonable person in Mr. Harris's position would have foreseen that the police searching a bedroom would likely inspect any containers within that bedroom in conjunction with executing their search. If Mr. Harris had wished to limit the scope of his consent to exclude closed containers, or to exclude the bedroom entirely, he needed only to express this limitation. The agents' interpretation of his consent as including the right to search containers, such as backpacks, found in the bedroom was objectively

25

reasonable.  The search of the backpack and subsequent seizure of the scale are not barred by the Fourth Amendment.

## CONCLUSION

The Government has presented sufficient evidence to establish, by a preponderance of the evidence, that Mr. Harris consented to the search of his bedroom during his arrest on December 22, 2010.  While the ATF agents' accounts of the circumstances surrounding Mr. Harris's communication of his consent differed, they both testified with certainty that he communicated consent to a search.  Conversely, it is not clear from the record that Mr. Joseph was in a position to hear whether or not Mr. Harris provided consent.  There was no indication, other than the fact that consent was obtained in the course of an arrest, that Mr. Harris was under duress during this encounter or in any way coerced into consenting.  Mr. Harris's consent to search the bedroom did not impose any conditions, and a reasonable officer would have interpreted such open ended consent to include consent to search any closed containers such as a back pack found in the room.  The Government has thus established by a preponderance of the evidence that Mr. Harris's consent was voluntary and that it extended to include any closed containers found in the bedroom.  Therefore, the Defendant's motion to suppress is denied.

IT IS SO ORDERED.

Dated:  New York, New York
        July 26, 2011

                                    Robert P. Patterson, Jr.

                                          U.S.D.J.

Copies of this opinion were faxed to:


Attorney for Defendant:

Andrew J. Ceresney
Debevoise & Plimpton, LLP (NYC)
919 Third Avenue,31st Floor
New York, NY 10022
(212)-909-6947
Fax: (212)-909-6836

Parvin Daphne Moyne
Todd Blanche
U.S. Attorney's Office, SDNY (St Andw's)
One St. Andrew's Plaza
New York, NY 10007
(212)-637-2510
Fax: (212)-637-2527